# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| JIMMY LEE EVERETT, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| v. | ) | Case No. CV411-150 |
| | ) | CR408-063 |
| | ) | CR607-031 |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## REPORT AND RECOMMENDATION

Jimmy Lee Everett was sentenced by this Court to serve 110 months' imprisonment for (1) trafficking in vehicles with altered identification numbers and (2) bank fraud related to his embezzlement of funds from his employer. (Doc. 17 at 3.) After an unsuccessful appeal of his sentence, *United States v. Everett*, 368 F. App'x 952 (11th Cir. 2010), he filed a 28 U.S.C. § 2255 motion raising four grounds for relief. (Doc. 1.[1]) Upon initial review, the Court found that all but the fourth ground -- asserting ineffective assistance of counsel at sentencing

---

[1] Unless otherwise noted, citations are to the docket in Everett's civil case, CV411-150. Additionally, page references are to the CM/ECF screen page rather than the referenced document's own internal pagination.

-- were meritless.[2] (Doc. 17; *see also* doc. 13 (ordering further briefing on the fourth ground).) Because there was a factual dispute as to that claim, the Court set the matter down for an evidentiary hearing and appointed counsel to represent Everett at that hearing. (Doc. 41.)

I. BACKGROUND

As the Court explained in its prior order,

> Everett was named in three federal indictments in 2007 and 2008. First, he was charged in December 2007 as one of 23 defendants who conspired to steal vehicles, change their identification numbers, and then sell them for a profit. *United States v. Patterson*, No. CR607-031, doc. 1. Specifically, he was indicted for conspiracy, trafficking in vehicles with altered identification numbers, trafficking in stolen vehicles, and possession of counterfeit vehicle titles. *Id.*, doc. 1; (Presentence Investigation Report ("PSI") ¶¶ 1-7). Then, in April 2008, Everett was charged with 34 counts of bank fraud and one count of making a false statement to a federally insured institution. *United States v. Everett* ("*Everett* I"), No. CR408-063, doc. 1. That indictment related to his embezzlement of more than $200,000 from his business, Thompson Pavement Markings, Inc. ("TPM").[3] *Id.*; (PSI ¶¶ 8, 93-97). In a superseding indictment in that case he

---

[2] Everett's first three grounds should be denied for the reasons explained in the prior order. (Doc. 17.)

[3] Everett, who is African-American, headed TPM as its nominal owner in order to better compete for state contracts. Colleen and Vince Thompson contributed most of their personal wealth to create the company. Colleen was an officer, but Vince was forced to step aside as officer, as his presence disqualified them from obtaining an advantage in state contracting as a minority-owned business.

2

was also charged with aggravated identify theft. *Everett*, No. CR408-063, doc. 15. Finally, in May 2008, Everett was indicted for obstruction of justice for his attempt to concoct a story exculpating him and the other *Patterson* defendants from their misdeeds. *United States v. Everett ("Everett II")*, No. CR608-007, doc. 3; (PSI ¶ 9).

Everett pled guilty to count six of the stolen vehicle indictment, *Patterson*, No. CR607-031, doc. 1, charging him with trafficking vehicles with altered identification numbers. *Id.*, doc. 448. He also pled guilty to one count of embezzlement in *Everett* I, No. CR408-63, doc. 21, and in return, the obstruction indictment, *Everett* II, No. CR608-007, was dismissed.

(Doc. 17 at 2-3 (footnotes added and omitted).)

The probation officer assigned to the case recommended in a consolidated Presentence Investigation Report ("PSI") that Everett receive a two-point offense level enhancement in the bank fraud/ embezzlement portion of the case pursuant to United States Sentencing Guidelines ("USSG") § 2B1.1(b)(10)(C)(i),[4] since he "forged the name of Colleen Thompson to open [a] fraudulent checking account with Sea Island Bank" for the purpose of embezzling TPM funds. (PSI ¶ 121.)

---

[4] This section creates an offense level enhancement when a fraud or embezzlement offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." USSG § 2b1.1(B)(b)(10)(C)(i). The commentary to the rule makes clear that merely forging a signature is not considered "producing another means of identification." USSG § 2B1.1 commentary.

3

Everett, however, steadfastly insisted that he had not forged Thompson's name on the signature card. At sentencing, the government admitted that the signature was not a forgery, but the parties agreed that Everett had improperly obtained the signature card and used it in an inappropriate manner, without Mrs. Thompson's consent. (Cr. doc. 43 at 4-5 (sent'g tr.).) The PSI had denied Everett a two-point downward adjustment based on his insistence that the signature was not a forgery. (PSI ¶ 133.) After the government admitted that the signature was not, in fact, forged, the effect was to allow Everett to obtain that adjustment. (Cr. doc. 43 at 5.)

Everett was assigned a total offense level of 30 for the vehicle offenses, and 23 for the embezzlement offense. (PSI ¶¶ 117, 125.) The PSI recommended that the cases be "grouped" for a concurrent sentence under USSG § 3D1.4.[5] Since the two crimes were within 8 points of

---

[5] USSG § 3D1.4 provides: "Determining the Combined Offense Level. The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the amount indicated in the following table:

Number of Units   Increase in Offense Level

1                 none
1 1/2             add 1 level

4

each other but more than 4 points apart, the embezzling offense equaled "1/2" of a group. Hence, the PSI added one additional point to the automobile offense, resulting in a total effective offense level of 31. (PSI ¶ 136); USSG § 3D1.4. Subtracting two points for acceptance of responsibility, the offense level dropped to 29. (Cr. doc. 43 at 5.) With Everett's category III criminal history, the recommended sentencing range was 108 to 135 months imprisonment. (*Id.*); USSG Sentencing Table. "In a consolidated judgment, the sentencing judge imposed 108 months of imprisonment on the vehicle trafficking count and 110 months on the bank fraud count, both to be served concurrently.

---

| 2 | add 2 levels |
| 2 1/2 –3 | add 3 levels |
| 3 1/2 –5 | add 4 levels |
| More than 5 | add 5 levels. |

In determining the number of Units for purposes of this section:

(a) Count as one Unit the Group with the highest offense level. Count one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious.

(b) Count as one-half Unit any Group that is 5 to 8 levels less serious than the Group with the highest offense level.

(c) Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level. Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level."

5

*Patterson*, No. CR607-031, doc. 682; *Everett I*, No. CR408-063, doc. 33." (Doc. 17 at 3.)

## II. ANALYSIS

The sole remaining issue is whether Everett's counsel was ineffective in failing to object to the USSG § 2B1.1(b)(10)(C)(i) two-point enhancement. That section provides for an enhanced sentence where a fraud or embezzlement offense "involved . . . the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification . . . ." *Id.* It has been referred to as the "identity theft enhancement." *United States v. Rosso*, 2012 WL 4839132 at * 1 (11th Cir. Oct. 10, 2012).

His claim rests on two arguments. First, he asserts that Classens should have contested the government's factual recitation at sentencing, since Colleen Thompson willingly signed the signature card allowing him to open the account. Second, he claims that Classens should have realized that the enhancement only applies to individual, not corporate, victims.

Everett has failed to carry his burden as to the factual recitation for several reasons.[6] First, while he now insists that he did *not* defraud or dupe Thompson into affixing her signature on the card under false pretenses, he never contested the application of the enhancement at sentencing. (*See* cr. doc. 43 (sent'g tr.)); *cf. Blackledge v. Allison*, 431

---

[6] On ineffective assistance of counsel claims the Court applies *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which created a two-part test for determining whether counsel performed ineffectively. First, the movant must demonstrate that his attorney's performance was deficient, which requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." 484 U.S. at 687. Second, the defective performance must have prejudiced the defense to such a degree that the results of the trial cannot be trusted. *Id.*

Under the performance prong, the reasonableness of an attorney's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.* at 690. It is generally appropriate to look to counsel's performance throughout the case in making such a determination. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986). The movant carries a heavy burden, as "reviewing courts must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689. Indeed, Everett must show that "'no competent counsel would have taken the action that his counsel did take.'" *Ford v. Hall*, 546 F.3d 1326, 1333 (11th Cir. 2008), *quoting Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc).

For the prejudice prong Everett must show that there was a reasonable probability that the results would have been different but for counsel's deficient performance. *Kimmelman*, 477 U.S. at 375; *Strickland*, 466 U.S. at 696. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Lightbourne v. Dugger*, 829 F.2d 1012, 1022 (11th Cir. 1987); *Boykins v. Wainwright*, 737 F.2d 1539, 1542 (11th Cir. 1983).

U.S. 63, 74 (1977) (representations of defendant at a hearing carry a strong presumption of verity, and subsequent presentation of conclusory allegations to the contrary are subject to summary dismissal). Moreover, the evidence against his version of the events is so overwhelming as to render his testimony utterly unbelievable. While Colleen Thompson, who would have been a key witness, was under treatment for a brain tumor and was unable to testify at the hearing, the government presented convincing testimony from Classens, Vince Thompson (Colleen Thompson's husband), Sue Strickland, and Deven Cuthbert -- testimony that persuades the Court that there is no truth to Everett's latest story.

According to Everett, TPM needed a loan in order to purchase additional equipment for a job. Because the company had gone over the limits of a line of credit held by BB&T, he insisted that he acted with the knowledge and consent of the other company officers in approaching Sea Island Bank for additional funding. Everett insisted that the company already had a prior one-year loan with the bank that had been renewed on several occasions to prevent a default. While TPM had

missed interest payments and had not made any principal payments at all, Everett sought to have the Sea Island loan officer that he had worked with in the past approve some sort of restructuring. After a change in loan officers, however, Sea Island refused to allow TPM to roll the debt over again, and it declined to extend additional credit to the company. In order to appease the new loan officer, Everett claimed that he was required to open a checking account and do a title exchange on some equipment already in TPM's possession. Everett needed a signature card, corporate resolution, and corporate account agreement to open that account. He stated that he brought the forms to Mrs. Thompson and she signed them while her mother and daughter-in-law were present. According to Everett, he did not establish the account to trick anyone; it was simply the only way the company could restructure its debt and acquire the necessary equipment. He readily admitted, however, that he pilfered funds from that account.

Sue Strickland, a branch manager who had worked with the Thompsons for years at BB&T and then Sea Island Bank, furnished contrary testimony that completely undermined Everett's story. She

explained that TPM was *never* substantially in default on any Sea Island loan.[7] Additionally, she noted that not only was there no bank policy requiring the opening of an account to obtain funding, *it is illegal* to condition a loan upon the opening of a bank account. (*See* ex. 3 (deposit account agreement opening a bank account in *2007* with Sea Island); ex. 4 (loan payoff table, showing that the Thompsons actually paid the loan off early)).

Further undermining Everett's account, the government offered testimony from Devon Cuthbert, who shared a cell with Everett while he awaited the § 2255 hearing. Cuthbert, detained on a gun charge, testified that Everett told him that he gave Mrs. Thompson a stack of paperwork knowing she would not read every paper. He had intentionally obfuscated the paperwork in order to open the checking

---

[7] Vince Thompson, Colleen's husband, explained that TPM had primarily worked with First National of Effingham and then BB&T, not Sea Island. The only loan they took out with Sea Island was in 2004 for the purchase of some equipment from one of their competitors. (*See* ex. 1 (Sea Island loan).) The loan was to run for 60 months; it was not a one-year renewable. (*Id.*) There was a renewable loan (ex. 2), but that was with Darby Bank & Trust, *not* Sea Island. Moreover, the only Sea Island loan was taken out in the Port Wentworth office in 2004, while the checking account was opened in Statesboro in 2007. When Everett was arrested the Thompsons were stunned to discover that Everett had opened a corporate checking account at his address in Statesboro and that his girlfriend utilized that account.

account without TPM's authorization. According to Cuthbert, Everett was extremely optimistic about his § 2255 prospects. In fact, he exulted in Mrs. Thompson's illness by exclaiming that the "bitch got a brain tumor!", reflecting his belief that he was sure to prevail given her inability to testify.[8] Everett did not endeavor to contradict any of Cuthbert's testimony.

Considering all of the testimony, the Court finds Everett's version of the events to be unworthy of belief. Everett is an inveterate fraudster, as reflected by his prior convictions for forgery and passing bad checks (PSI ¶¶ 138-142)) and by his attempt in this case to persuade his co-conspirators to concoct a false story regarding their vehicle theft scheme in order to mislead the authorities. *Everett* II, No. CR608-007, doc. 3; (PSI ¶ 9). Classens, then, did not render deficient performance by failing to object to the government's factual recitation at sentencing.

Everett's second contention, that Classens rendered deficient performance by failing to challenge the USSG § 2B1.1(b)(10)(C)(i)

---

[8] Cuthbert and another detainee, Cecil Nelson, wrote a letter to the United States Attorney assigned to the case, prompting him to meet with Cuthbert about this matter.

enhancement on the basis that it applies only to individual as opposed to corporate victims, likewise fails. (Doc. 2 at 28-29; doc. 44 (brief following hearing).) The relevant comments note that the "means of identification" improperly employed must belong to an "actual (i.e., not fictitious) individual." USSG § 2B1.1, comment 9(A). The comment can be read in multiple ways. Under one interpretation, it means that the enhancement applies only to living and breathing individuals, not corporations or other associations. Under a different reading, it simply means that the enhancement does not apply where the perpetrator created a new identity out of whole cloth. As the Ninth Circuit notes, the enhancement "is rather awkwardly written," *United States v. Melendrez*, 389 F.3d 829, 832 (9th Cir. 2004), and research reveals that courts across the land have struggled with its application.

Everett points to some authority which seems to support his position. *See United States v. Hilton*, 701 F.3d 959, 966 (4th Cir. 2012) (Congress's intention in drafting the provision is unclear, hence the rule of lenity applies and the provision cannot be applied to the theft of corporate identities); *Alfano v. United States*, 592 F. Supp. 2d 149, 156-

60 (D. Me. 2008) (same; "person," which includes corporations, is distinct in the guidelines from "individual," which does not; additionally, related statutory provisions define "individuals" as separate from "organizations"). But these cases appear to be distinguishable on their facts. If the first "means of identification" here was Mrs. Thompson's fraudulently obtained signature[9] and the second was the checking account, then there appear to be two victims, one individual and one corporate. In neither *Hilton* nor *Alfano* did the defendants ever obtain a form of identification from any specific individual. The defendants in *Hilton* used a fake corporate stamp bearing no individual signature to endorse stolen checks that they later deposited. 701 F.3d at 962 (defendants used a stamp that stated: "Pay to the order of Suntrust Bank 053100465. For deposit only Woodsmiths [Furniture Company] 1000036388063."). Similarly, the *Alfano* defendant created fake checks from Atlantic Coast Contractors using a Toys 'R' Us account number. This case is more akin to *United States v.*

---

[9] In a prosecution for identity theft under 18 U.S.C. § 1028(d)(7), the Eleventh Circuit has held that a defendant's use of another person's signature on forged checks qualified as the "use of a means of identification." *United States v. Shanks*, 452 F. App'x 922, 923-24 (11th Cir. 2012).

13

*Oates*, 427 F.3d 1086 (8th Cir. 2005), where the defendant used a person's social security number to create a credit card in the name of a fictitious business. *Id.* at 1089. The defendant argued that the enhancement should not apply because that means of identification was not used to create another means of identification that related to "an actual (i.e., not fictitious) individual." *Id.* at 1089-90. The panel rejected the argument, noting that the creation of the credit card account still harmed the credit of the person whose social security number was misappropriated. *Id.* at 1090. Similarly, the creation of the account in this case permitted Everett to steal large sums of money from the corporation that Thompson co-owned, and it inevitably harmed her credit, as the Thompsons were personally liable on much of the company's debt. (*See* ex. 1 at 2 ("PERSONAL GUARANTIES-VINCENT THOMPSON, JULIA THOMPSON, & JIMMY L EVERETT.").) Indeed, Vince Thompson testified that the Thompsons were financially ruined as a result of Everett's fraud.

Regardless, there is no clear answer in *this* circuit as to whether the enhancement should apply to corporate victims, and it is unclear how

the enhancement would apply on *these* facts in those courts that have otherwise rejected corporate victims. Consequently, this Court cannot fault Classens for failing to pursue the matter. *See Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004) ("If the legal principle at issue is unsettled counsel will not have rendered deficient performance for an error of judgment."); *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999) ("'the rule that an attorney is not liable for an error in judgment on an unsettled proposition of law is universally recognized.'") (quoting 2 RONALD E. MALLEN & JEFFREY M. SMITH, LEGAL MALPRACTICE § 17.4, at 502 (4th ed. 1996)).

Finally, as to both portions of Everett's claim, Classens had a valid reason for choosing not to dispute the matter. He explained at the hearing that it was his sentencing strategy to allow the enhancement, even if he personally disagreed with its application, because he needed the cases to fall within 8 offense-level points of each other under the guidelines' grouping rules in order to have a compelling reason to argue against the imposition of consecutive sentences. As noted above, Everett benefited from that strategy, since he actually received concurrent

sentences. Moreover, Everett would be hard pressed to show any resulting prejudice. Even if Everett avoided the enhancement, he would obtain only a *one-point* reduction under the grouping rule, USSG § 3D1.4, since the two groups would have varied by more than 8 points.[10] *See* USSG § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the group with the highest offense level."). The sentencing judge might take exception to imposing a sentence that "disregards" the embezzlement charges. And, should he be resentenced, the sentencing judge would be free to impose consecutive sentences. In other words, even if Everett won a resentencing, he is by no means guaranteed a lower sentence, much less the same sentence. In fact, resentencing might result in consecutive sentences, as Classens feared. *See United States v. Stinson*, 97 F.3d 466 (11th Cir. 1996) (once an original sentence is vacated in *toto*, the sentencing judge is free to reconstruct the sentence using any of the sentencing components at his disposal (current conviction, prior offenses, cooperation, etc.)).

---

[10] The vehicle offenses had an adjusted offense level of 30 and the embezzlement adjusted offense level was 23. (PSI ¶¶ 127-28.) Had the embezzlement offense been dropped to 21, then the offenses would be more than 8 points apart.

## III. CONCLUSION

For the foregoing reasons, along with those expressed in its earlier order setting this matter down for a hearing (doc. 17), Everett's § 2255 motion should be **DENIED**. Applying the Certificate of Appealability ("COA") standards, which are set forth in *Brown v. United States*, 2009 WL 307872 at * 1-2 (S.D. Ga. Feb. 9, 2009) (unpublished), the Court discerns no COA-worthy issues at this stage of the litigation, so no COA should issue. 28 U.S.C. § 2253(c)(1); *see Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (approving *sua sponte* denial of COA before movant filed a notice of appeal). And since there are no non-frivolous issues to raise on appeal, an appeal would not be taken in good faith. Thus, *in forma pauperis* status on appeal should likewise be **DENIED**. 28 U.S.C. § 1915(a)(3).

**SO REPORTED AND RECOMMENDED** this 15th day of February, 2013.

/s/ Smith
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

17